# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

MICHAEL AND ANNA BELKIN, individually and by and on behalf of LEV BELKIN, a child,

Plaintiffs,

vs.

THE SIOUX CITY COMMUNITY SCHOOL DISTRICT, and THE WESTERN HILLS AREA EDUCATION AGENCY,

Defendants.

No. C03-4087-MWB

**MEMORANDUM OPINION AND ORDER REGARDING JUDGMENT ON THE ADMINISTRATIVE RECORD**

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   *A. Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   *B. Retaliation Claim Under The Rehabilitation Act* . . . . . . . . . . . . . . . 16

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

Plaintiffs Michael Belkin and Anna Belkin (collectively "the Belkins"), individually and on behalf of their minor son, Lev Belkin, appeal the decision of the Iowa Department of Education under Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The matter is before the court for judgment on the administrative record.[1]

Plaintiffs Michael Belkin and Anna Belkin filed a request with the Iowa Department of Education for a due process hearing alleging that defendant Sioux City Community School District ("SCCSD") and defendant Western Hills Area Education Agency 12 ("WHAEA") denied a free and appropriate public education ("FAPE"), as required by the IDEA, to their son, plaintiff Lev Belkin. Specifically, the Belkins alleged that Lev was

---

[1] The IDEA is a comprehensive education statute which seeks to ensure that children with disabilities receive "a free appropriate public education . . . designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). The IDEA requires state or local agencies receiving federal funds under subchapter II of IDEA to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies." 20 U.S.C. § 1415(a); *see also Honig v. Doe*, 484 U.S. 305, 310-12 (1988). If the parents of a child with disabilities believe that the state or local agencies are not performing properly, they may present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). A parent who files a complaint has the right to an "impartial due process hearing" conducted by either the state or local educational agency. 20 U.S.C. § 1415(f)(1). This court has jurisdiction over this matter pursuant to 20 U.S.C. § 1415(i)(2)(A), which allows any party who has been "aggrieved by the findings" of the IDEA administrative procedures "the right to bring a civil action. . . in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A).

being denied a FAPE in the following ways: that the SCCSD and WHAEA were failing to comply with provisions of his Individualized Education Program ("IEP"); that Lev's one-on-one aide, Anna Belkin, was retaliated against for advocating on Lev's behalf; and, that the SCCSD and WHAEA failed to offer Michael and Anna Belkin credible assurances that Lev's IEP would be fairly and fully enforced in the classroom. The Belkins subsequently submitted an amended and substituted request for a due process hearing alleging that the SCCSD and WHAEA were failing to provide Lev with a FAPE by changing material provisions of Lev's IEP without the prior written notice to Michael and Anna Belkin mandated by the IDEA, specifically the IEP's assurance that Lev's one-on-one aide would not be changed until both the IEP team and Dr. Koegel determined that a new aide could meet Lev's needs, failing to comply with a provision of Lev's IEP concerning the replacement of his one-on-one aide, failing to monitor and enforce the provisions of Lev's IEP concerning intervention techniques and supports in the classroom, retaliating against Lev's one-on-one aide, Anna Belkin, for advocating on Lev's behalf, and failing to offer Michael and Anna Belkin credible assurances that Lev's IEP would be fairly and fully enforced in the classroom. The Belkins also alleged that the retaliation against Lev's one-on-one aide, Anna Belkin, for advocating on Lev's behalf, violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

Following a four day hearing, an administrative law judge ("ALJ") found that the SCCSD and WHAEA offered a legitimate reason for their assignment of a replacement one-on-one aide for Lev, namely that the decision to replace Anna Belkin was a personnel decision related to the breakdown in confidence and communication between Anna Belkin and the regular classroom teacher, and that the Belkins had failed to demonstrate that the decision to replace Anna Belkin was due to her advocacy for Lev. Therefore, the ALJ found that there was insufficient evidence to support the Belkins's allegation of

3

discriminatory retaliation under either the IDEA or § 504 of the Rehabilitation Act. The ALJ thus also denied the Belkins' claim that the SCCSD and WHAEA had denied Lev a FAPE by retaliating against his one-on-one aide for advocating on his behalf. The ALJ further found that the SCCSD and WHAEA did not deny Lev a FAPE by changing the prior IEP's assurance that Lev's one-on-one aide would not be changed until both the IEP Team and Dr. Koegel determined that a new aide could meet his needs. The ALJ concluded that the omission was a procedural deficiency that did not compromise Lev's right to an appropriate education, seriously hamper Lev's parents opportunity to participate in the formulation process, or cause a deprivation of education benefits. Moreover, the ALJ noted that when the SCCSD did initiate a change in Lev's one-on-one aide, his parents were provided notice. The ALJ, however, did conclude that the SCCSD and WHAEA did deny Lev a FAPE by failing to monitor and enforce the provisions of his IEP concerning intervention techniques and supports in the classroom.

In this case, the Belkins appealed all of the ALJ's rulings adverse to them. However, after the filing of the Belkins' Amended and Substituted Complaint, the parties filed a Joint Stipulation in which the parties stipulate to the following facts: that Lev Belkin has returned to attending school in a regular classroom with Anna Belkin once again serving as his one-on-one aide; that Anna Belkin has enjoyed a professional working relationship with Lev's regular classroom teacher; and, that the Belkins have suffered no damage and seek no recovery of any kind whatsoever for an alleged act or omission of the defendants. Thus, the only issue before the court is whether the SCCSD took action against Anna Belkin that violated § 504 of the Rehabilitation Act's prohibition against retaliation.

4

## B. *Factual Background*

Lev Belkin is a minor child who lives with his parents, Michael and Anna Belkin, and sister, Katrina, in Sioux City, Iowa. Lev has autism. At the age of two, Lev was referred for a comprehensive evaluation to determine if he would qualify for special education services because of his parents' concerns regarding his language development. The results of this evaluation indicated that Lev had significant problems in verbal and nonverbal communication, social interaction, and consistency of intellectual responding. The evaluation team, which consisted of school psychologist John Vermilyea, speech pathologist Terri Porter and audiologist Dan Dailey, recommended that Lev participate in the WHAEA TOT class and homebound instruction. An Individualized Family Service Plan ("IFSP") was developed for Lev. The IFSP called for 60 minutes of home instruction and 105 minutes of instruction in the TOT program per week as well as 60 minutes per week of speech and language services.

Lev's parents were dissatisfied with Lev's progress and requested that the WHAEA begin using a 50 hour per week discrete trial training ("DTT") with Lev. An IEP was developed for Lev in which he would be placed in the Riverside School Intensive Early Childhood Special Education program, which incorporated a structured, discrete trial, visually based approach. After four months in the DTT program at the Riverside School, the Belkins requested a full-time home based program for Lev. The home based program was successful for Lev. Lev continued in the home based program for two years. A decision was then made for Lev to attend an early childhood special education Head Start program and also continue with a portion of his home based program. Anna Belkin did not believe the Head Start program was appropriate for Lev. The Belkins subsequently attended a training program at the University of California at Santa Barbara. The clinical director of the Autism Research and Training Center, Dr. Lynn Koegel, recommended that

5

Lev's expressive language be targeted using pivotal response training ("PRT"). PRT uses applied behavior analysis ("ABA") procedures that are positive, self-enforcing, and family centered. Dr. Koegel recommended use of PRT in Lev's preschool setting.

Anna Belkin was trained to use PRT. Joy Ruess, Lev's home program provider, also attended the training at Santa Barbara. Upon returning home, the Belkins indicated that they were upset with Joy Ruess's behavior during the training and insisted that she not be Lev's aide. Lev was subsequently reevaluated and it was suggested that Lev continue in the Riverside preschool program with an instructional assistant for the remainder of the year and that he start kindergarten the following fall. Anna Belkin believed that the Riverside preschool program was not following the recommendations of Dr. Koegel and Lev's autistic behaviors were becoming more intense. The Belkins unilaterally took Lev out of the Riverside preschool program and enrolled him in a preschool program affiliated with Briar Cliff University. Lev was successful in that program.

A meeting was later held to determine who would be trained to assist Lev in his kindergarten year as his one-on-one aide. Susie Adam was interested in training to be Lev's aide. A training program was planned which involved Susie training first in Lev's home program and then accompanying Anna to the preschool setting to continue training there. The Belkins did not believe that Susie could work effectively with Lev and that, as a result, his behavior intensified and it took two days to reestablish Lev's behavior control. Dr. Koegel viewed a videotape of Susie Adam's interaction with Lev and concluded that she would need more extensive training before she could facilitate an appropriate program for Lev. Anna reported Dr. Koegel's concerns to Donna Dwyer, who was to be Lev's kindergarten teacher. Subsequently, Susie Adam decided not to apply for the position as Lev's one-on-one aid. Instead, Anna decided to apply to be Lev's one-on-one aid.

Jean Peters, Director of Special Education for the SCCSD met with Michael Belkin

and asked that Anna be assigned as Lev's one-on-one aide in kindergarten. The two discussed the advantages and disadvantages of having Anna being assigned as Lev's one-on-one aide. Among the advantages of having Anna serve as Lev's one-on-one aide were that Anna was already trained in PRT, devoted to her son, and ready, willing and available to serve while the disadvantages included the difficulty in separating the role of parent from instructional assistant as well as the concern over Anna having to implement both home therapy of Lev and also serve as Lev's one-on-one aid in school. Following that discussion, the Belkins met with Jean Peters, Roger Hess, WHAEA director, and Steve Crary, SCCSD's Human Resources Director. Anna was told at this meeting that the school district had found someone to train and that Anna could not apply for the aide position. Crary explained that the SCCSD had an employment practice regarding the hiring of displaced district employees and that the SCCSD was obligated to follow this policy in this instance since one such employee, Julie Bell, who had experience working with autism, had expressed an interest in being Lev's one-on-one aide. Peters discussed the option of Lev going to a summer school program with Anna and an aide going along for training purposes. Anna would also be allowed to go with Lev into the classroom at the beginning of the year for additional training. Dr. Koegel was consulted and she felt that this was an acceptable plan. Dr. Koegel thought that the phasing out of Anna's role would occur then they saw a positive trend in Lev's attending to tasks. Dr. Koegel agreed to watch and critique a video of the aide as she was shadowing Anna during the aide's training. Michael Belkin requested that he be permitted to help in the selection of Lev's one-on-one aide. Peters indicated that he would be introduced to Julie Bell and that the SCCSD would welcome his input concerning the progress of the training but that ultimate selection of Lev's aide would lie with SCCSD employees. Michael agreed to have Anna contact Peters so that they could find a preschool for Lev for the upcoming summer.

7

The next day, Michael wrote a letter to Peters expressing his concerns about the insufficient time to train an aide for Lev and asking questions regarding equal opportunity employment within the SCCSD and whether the WHAEA had policies concerning the employment of parents for children with special needs. Peters replied in a letter, assuring Michael that Anna would be involved in the training of Lev's aide and that Dr. Koegel would be assisting in determining the length of the training. Peters also informed Michael that the WHAEA did not have a policy preventing parents from working with their children.

Peters then called Michael to outline the training options for Julie Bell. Lev was to attend the Children's Center preschool and the SCCSD would pay the tuition and both Anna and Julie Bell would attend. Anna would train Julie Bell and videotapes of the training would be sent to Dr. Koegel. Peters indicated that once school began Anna would accompany Lev and Julie Bell to kindergarten and continue doing so until a positive trend line was established. Michael still had many concerns and the next day he met with Richard Bathurst, the SCCSD's Assistant Superintendent, to discuss Anna's application for the aide position. Bathurst did not see any problem with Anna serving as Lev's one-on-one aide. Subsequently, the Belkins met with Bathurst, Peters, Crary and principal Bartek to discuss options for Lev's one-on-one aide. Four options were put forward during the meeting. The first option was to hire Julie Bell and have her train with Anna over the summer and in the kindergarten setting as school started. The second option also involved hiring Julie Bell and having Anna train her through the first semester of kindergarten. A determination would be made in consultation with Dr. Koegel as to when Anna's training would no longer be needed. The third option was to put Anna in the classroom as Lev's one-on-one aide on a volunteer basis. The fourth option was to put Anna in the classroom as a paid aide assigned temporarily as Lev's one-on-one aide. Michael presented a fifth

8

option of having Julie Bell train with Anna during the summer with no promise or commitment of hiring her in the fall. Although the group discussed the possible detriment of hiring a parent as an aide, the SCCSD agreed to the fourth option, having Anna assigned as Lev's one-on-one aide at Clark school for his kindergarten year.

Lev attended the half-day kindergarten program with teacher Mrs. Dwyer and also participated in his home program. Lev's year in kindergarten was successful. In the spring of Lev's kindergarten year, Dr. Koegel recommended that Anna be involved in Lev's educational program the following year, either as a direct aide or as a trainer of his aide.

Before Lev started first grade, a meeting was held to develop Lev's program for first grade. Lev's first grade IEP listed the following special education services: one hour of videotaping monthly, an one-on-one aide for Lev, speech and language services, autism team consultation four times per year, consultation with Dr. Koegel two times per month, reading instruction, in-home therapy, preteaching and priming materials being supplied to Lev's one-on-one aide, and pairing Lev on a daily basis with a variety of classmates in classroom and playground activities. Lev's IEP goals also called for "teacher prompts" in order to reduce the prompts from the one-on-one aide, and that peer prompts were to be encouraged.

Sandy Reed was Lev's first grade teacher. Reed had twenty-five years teaching experience and previously had a child in her classroom who required an one-on-one aide. Lev was not the only child in Reed's first grade classroom that year who required an one-on-one aide. One other such child was assigned to Reed's classroom at the same time as Lev. Several months into Lev's first grade year, the Belkins had developed several concerns about the implementation of Lev's IEP in Reed's first grade classroom. A videotape was not recorded in November as called for in Lev's IEP. Although one was

9

recorded in December, the Belkins had difficulty receiving the videotape and sending it to Dr. Koegel in California. This difficulty was the result of the decision of the SCCSD to make copies of the videotapes before sending them to Dr. Koegel. Lev's IEP also required that preteaching and priming materials were to be provided to Lev's one-on-one aide. Preteaching and priming involves preparing a child for interaction by introducing the child to the tasks and activities ahead of their actual presentation in the classroom. In Lev's case, the teacher would send materials home with Anna so that she could preteach Lev, thereby ensuring more successful responses during class. The Belkins had concerns about some preteaching material not being supplied to Anna. The Belkins also were concerned that Reed was not following Lev's IEP by asking Lev very few questions, saying "no" instead of reinforcing attempts, not simplifying her language, not calling on Lev when his hand was raised, and not creating opportunities for Lev to work with other children in small groups. The Belkins were further concerned with long waiting periods during the day when Lev was not engaged. In addition, while a goal of Lev's IEP was to shift more than 50 percent of Lev's prompts from his one-on-one aide to his teacher and peers, the Belkins were concerned that Reed was not encouraging peer prompting.

By November 25, 2002, the relationship between Anna and Reed had seriously deteriorated. On November 25, 2002, the Belkins, Reed, Cyndi Turner, the principal, and Suz Ann Jansen, special education teacher for the multi-categorical, resource teaching program, met to discuss Lev's program. Michael Belkin had prepared a list of concerns regarding Reed's failure to fully implement Lev's IEP. In discussing Lev's need to work with classmates in small groups, Anna gave as an example her view that Reed had not permitted Lev to go to a station in a classroom project to explore sizes and textures of objects. Reed disagreed with Anna as to what had occurred. Reed related that Anna had temporarily removed Lev from the room and had missed one of the stations in the exercise,

10

one involving cornmeal, during his absence. Upon Lev's return to the classroom, Reed had deferred the decision to Anna as to whether Anna wanted Lev to do the cornmeal station and accepted Anna's decision to have Lev skip it. As a result of these diametrically opposite statements of what had transpired, tension in the meeting rose and resulted in Reed and Anna each accusing the other of lying about what had transpired. Anna also described the incident as discrimination. Following this exchange, Reed began crying and was so upset that she left the room.

Following the November 25th meeting, Reed reported to Turner that things were not going well in the classroom and that working conditions were not acceptable. A meeting was scheduled for December 5, 2002, with Jean Peters, Reed, Turner, and Bruce Lear, a teacher union representative who was invited to attend by Reed. Peters also directed Turner to set up a meeting on December 9, 2002, with the Belkins. During the December 5th meeting, in which the atmosphere was tense, the participants discussed the November 25th meeting. Reed reported that Anna was not speaking to her and that Anna was keeping a log on her. Reed indicated that the situation with Anna was creating difficult working conditions. Reed was resistant to working out a resolution but the group discussed some options: that Anna and Lev could go into another classroom, that Lev would stay in Reed's classroom but with another one-on-one aide, or resolution of the current conflict so that the existing relationship could be continued. Reed was not receptive to the last option, but no decision was made and it was agreed that the consideration of options would again be broached during the meeting on December 9th.

On December 6, 2002, Anna was called into Principal Turner's office. Turner informed her that Reed no longer trusted her or her work with her. Principal Turner gave Anna two options: Lev and Anna could go into another classroom, or Lev could stay in Reed's classroom but with another one-on-one aide. Turner also told Anna that a meeting

was scheduled for the following Monday morning and requested that Anna make her decision over the weekend.

The Belkins did not consider either option acceptable. They believed that Lev needed to remain with his established peer group and no other aid was trained or qualified in their view to meet Lev's needs. Since they only had the weekend to consider the two options, the Belkins called SCCSD Superintendent Williams at his home and requested a meeting. Superintendent Williams agreed to meet with the Belkins at 7:45 a.m. on December 9, 2002. Michael Belkin prepared a detailed letter of their concerns and presented them to Superintendent Williams.

Later on December 9, 2002, the Belkins bet with Peters, Crary, Turner and support personnel from WHAEA. Crary informed the group that Superintendent Williams would make the final decision concerning Lev's one-on-one aid. Michael Belkin reviewed the prior meeting on November 25th and tried to confirm that the issues raised in that meeting concerned the implementation of Lev's IEP and not personal attacks on Reed. The group discussed Anna's performance as an aide. Specifically, the issue of Anna's late arrival time was resolved. It was determined that Anna would arrive at 8:45 a.m. Next, Anna was instructed to take notes in the classroom only on Lev and not on the classroom teacher, Reed. The group also discussed Anna's role in the collection of data. Anna found the forms she had been requested to use by the SCCSD difficult to understand. It was determined by the group that new, "user-friendly" forms would be developed for her use. Finally, Peters directed Principal Turner to make sure that the videotaping of Lev required in Lev's IEP was conducted. These concerns were addressed in an effort to resolve the classroom conflict and not as evidence or reasons for Anna's termination. The SCCSD was not considering terminating Anna at this point but was giving serious consideration to transferring her to another aide position.

Following the meeting, Turner offered to be a mediator for a private discussion between Anna and Reed. When Anna arrived for that meeting, Turner asked permission to tape the meeting and asked if WHAEA speech pathologist Barb Lyle could attend. Reed had asked that Lyle attend the meeting as a neutral party. Anna did not view the meeting which occurred as a mediation but instead thought that she was accused of personally attacking Reed. The relationship between Reed and Anna was not repaired as a result of the meeting. Following that meeting, Michael Belkin met with both Principal Turner and then later with Superintendent Williams.

Following the meeting on December 9th, Peters directed Turner to further investigate the Belkins' concerns. As a result, Turner began making frequent observations in Reed's classroom and reminded Reed of the importance of following Lev's IEP.

On December 11, 2002, the Belkins received a letter from Assistant Superintendent Linda Madison, informing them that the SCCSD had decided to hire another aide for Lev to replace Anna. Madison wrote: "I anticipate that this will take not more than 2-3 weeks. Please understand it is the District's prerogative to change employees when work relationships have been seriously damaged." Madison also indicated in the letter that Anna could assist in the transition, so long as a positive environment was maintained. Madison further asked Anna to meet with the personnel director to "discuss possible options of employment in the District should she so choose. I am not aware of current openings but Mr. Crary can provide assistance in this area." Madison also indicated that the Belkins were "welcome to occasionally stop in and observe the classroom" but instructed "that it cannot result in any disruption of the learning environment."

On January 8, 2003, Crary informed Anna that the SCCSD was hiring an aide for Lev. The Belkins were concerned that no one could be trained in the Pivotal Response Techniques in time to serve as Lev's aide. On January 9, 2003, Principal Turner drafted

13

a "Timeline and Plan for Assistant Transition." Under this outline, on January 13, 2003, the newly hired assistant was to observe Anna with Lev and Barb Lyle was to assist in the training. The outline further called for Jansen and Reed to meet with Anna, Lyle and the new aide at the end of that first day to discuss the day's activities. This procedure was to be duplicated the following Wednesday, January 15, 2003. According to the outline, on Thursday and Friday, the new aide was to work with Lev while Anna observed and assisted in the training. Then, according to the outline, during the following week, Anna would report to work at Clark School but was to be assigned as an aide in another classroom. Anna would be available to conduct training or consult if needed. Anna's last day of work at Clark Elementary was to be January 24, 2003.

Principal Turner's timeline was never implemented. On January 11, 2003, Michael Belkin wrote to Principal Turner informing her of the Belkins' decision "to pull Lev out of Clark School because he is not receiving an appropriate program." Michael's letter indicated as examples the absence of meaningful assignments, long waiting periods, very little task variation and the number of long auditory activities with excessive language. Michael summarized: "[Anna's] participation at school as his aide today is crucial for Lev's performance. Replacing [Anna] with an untrained aide in the current situation will be disastrous for Lev. I do not believe that without [Anna's] assistance Lev's IEP would be performed correctly. We are pulling Lev out of Clark School until a mutual agreement about changes in placement to provide an appropriate educational program for Lev is reached." In response to Michael's letter, Turner replied that she understood that the Belkins had chosen to home school Lev and provided instructions for obtaining permission to home school. Michael Belkin responded that the Belkins did not wish to home school but wanted to find an appropriate placement for Lev. Lev did not attend school for the remainder of the school year. From January through May 2003, Anna provided Lev's

educational plan at home. The SCCSD provided pre-teaching materials.

## II. LEGAL ANALYSIS
### A. Standard Of Review

When reviewing the decision of an ALJ, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). "This has been described as a 'modified de novo review,' or as 'involved oversight.'" *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003); *MM ex rel. DM v. School Dist. Greenville County*, 303 F.3d 523, 526 (4th Cir. 2002); *Erickson v. Albuquerque Pub. Sch.*, 199 F.3d 1116, 1120 (10th Cir. 1999); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir.1995); *Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 927 (10th Cir. 1995). Under this standard, courts are not free to substitute their own notions of sound education policy for those of the educational agencies they review, but rather they should give "due weight" to the administrative proceedings. *School Bd. of Indep. Sch. Dist. No. 11 v. Renollett,* 440 F.3d 1007, 1010 (8th Cir. 2006); *CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 636 (8th Cir. 2003); *see Henrick Hudson Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *Susan N.*, 70 F.3d at 757; *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1034 (3d Cir. 1993); *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991). A district court "must give 'due weight' because the administrative panel had an opportunity to observe the demeanor of the witnesses and because the court should not substitute its own educational policy for those of the school authorities that they review." *Renollett,* 440 F.3d 1010-11 (quoting *CJN*, 323 F.3d at 636) (quoting in turn *Strawn v. Missouri State Bd. of Educ.*, 210 F.3d

954, 958 (8th Cir.2000) (internal quotation marks omitted). Thus, this court has "discretion to determine how much deference to accord the administrative proceedings, and although the district courts 'must consider the administrative findings of fact, [they are] free to accept or reject them.'" *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 527 (3d Cir. 1995) (citations omitted). However, the court is "required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." *S.H.*, 336 F.3d at 270. The Sixth Circuit Court of Appeals has observed that "federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field." *Burilovich*, 208 F.3d at 566. The amount of deference a court should accord to the administrative proceedings thus depends on the extent to which educational expertise is relevant to the administrative findings. *Id.* at 567.

### *B. Retaliation Claim Under The Rehabilitation Act*

The Belkins assert that defendants retaliated against them for their advocacy for Lev by removing Anna as Lev's one-on-one aide. The ALJ found that although the Belkins had established a *prima facie* case of retaliation in violation of the Rehabilitation Act that the SCCSD and WHAEA offered a legitimate reason for their assignment of a replacement one-on-one aide for Lev, namely that the decision to replace Anna Belkin was a personnel decision related to the breakdown in confidence and communication between Anna Belkin and the regular classroom teacher, and that the Belkins had failed to demonstrate that the decision to replace Anna Belkin was a pretext for discrimination against the Belkins due to their advocacy for Lev.

Because the same basic standards and definitions are used in both the Americans With Disabilities Act and the Rehabilitation Act, cases interpreting either are applicable

and interchangeable for purposes of the court's discussion. *See Wojewski v. Rapid City Regional Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir. 2006); *Merson v. St. Louis Univ.*, 442 F.3d 1069, 1074 n.3 (8th Cir. 2006); *Perkins v. St. Louis County Water Co.*, 160 F.3d 446, 448 (8th Cir. 1998); *Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998); *Allison v. Department of Corrections*, 94 F.3d 494, 497 (8th Cir. 1996)*; Wooten v. Farmland Foods*, 58 F.3d 382, 385 n.2 (8th Cir. 1995); *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995).

To establish a *prima facie case* of retaliation, the Belkins must show that: "(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between (1) and (2)." *Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006); *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006); *Merson*, 442 F.3d at 1074; *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999); *Sims v. Sauer-Sundstrand Co.*, 130 F.3d 341, 343 (8th Cir. 1997); *Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d 98, 100 (8th Cir. 1995). If this prima facie showing is made, "'the burden then shifts to the defendant to proffer a legitimate nondiscriminatory reason for the adverse action.'" *Mershon*, 442 F.3d at 1074 (quoting *Amiri*, 184 F.3d at 1025-26). "'The burden of production then shifts back to the plaintiff to show that the defendant's reason is a pretext for discrimination.'" *Mershon*, 442 F.3d at 1074 (quoting *Amiri*, 184 F.3d at 1026).

In the present case, the court assumes for the sake of argument that the Belkins have established a *prima facie* case of retaliation. The Belkins' presentation of a *prima facie* retaliation case shifts the burden of production to defendants to rebut the presumption of retaliation with evidence that their decision to remove Anna as Lev's one-on-one aide from Reed's classroom was for a legitimate, non-discriminatory reason. On this point, the court agrees with the decision reached by the ALJ, namely, that the decision to remove Anna as

17

Lev's one-on-one aide from Reed's classroom was a personnel decision related to the breakdown in confidence and communication between Anna Belkin and Reed, as the regular classroom teacher. The relationship between Reed and Anna was already strained by the time of the November 25th meeting. However, at the November 25th meeting, Anna challenged the integrity and honesty of Reed, Lev's classroom teacher. This personal attack on Reed in the presence of school administrators culminated in a complete breakdown in trust between Anna and Reed, a situation which was irreversible. Thus, faced with a breakdown in the working relationship between Reed and Anna, defendants made the decision to remove Anna from Reed's classroom. Thus, the court concludes that defendants have rebutted the presumption of retaliation with evidence that their decision to remove Anna as Lev's one-on-one aide from Reed's classroom was for a legitimate, non-discriminatory reason. As a result, the burden of production shifts back to the Belkins to show that defendants' reason is a pretext for discrimination." *Mershon*, 442 F.3d at 1074; *Amiri*, 184 F.3d at 1026. On this point, the court again agrees with the decision of the ALJ that the Belkins have failed to meet their burden of proof on this issue.

The court notes that the Belkins had been vigorous advocates for their son for a number of years prior to the events at issue in this litigation and none of these prior occasions of advocacy resulted in any adverse action. Moreover, the court notes the willingness of defendants to accede to the choices made by the Belkins for Lev. In addition, the court notes that defendants offered the Belkins two options, one of which did not necessitate the removal of Anna as Lev's one-on-one aid, but that the Belkins rejected both of these options. It was only after both of these options were refused by the Belkins that defendants were forced to chose between the two options. The court also notes that the two choices offered to the Belkins are reflective of a personality conflict between Anna and Reed since both involved the separation of Reed from Anna. Accordingly, the court

finds that the Belkins have failed to demonstrate that defendants' reason for the adverse action taken was a pretext for discrimination. Thus, the court concludes that the Belkins have failed to establish that defendants retaliated against Anna in violation of § 504 of the Rehabilitation Act by removing her as Lev's one-on-one aide. Therefore, the court denies the Belkins' Rehabilitation Act claim and grants judgment in favor of defendants on the Belkins administrative appeal.

## III.  CONCLUSION

For the reasons discussed above, the court concludes that defendants have met their burden of providing a legitimate non-discriminatory reason for the adverse action taken in this case but that plaintiffs have failed to demonstrate that defendants' reason was a pretext for discrimination. Therefore, the court denies the Belkins' Rehabilitation Act claim and grants judgment in favor of defendants on the Belkins' administrative appeal.

**IT IS SO ORDERED.**

**DATED** this 12th day of October, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA